1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  FRANK J. RIEBLI (CABN 221152)
   Assistant United States Attorney
5
            450 Golden Gate Avenue, Box 36055
6           San Francisco, California 94102-3495
            Telephone: (415) 436-7200
7           FAX: (415) 436-7234
            Frank.Riebli@usdoj.gov
8
9  Attorneys for United States of America

10                         UNITED STATES DISTRICT COURT

11                       NORTHERN DISTRICT OF CALIFORNIA

12                              SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,           )  Case No.  CR 21-274 CRB
                                        )
14         Plaintiff,                   )
                                        )  GOVERNMENT'S MOTION TO DETAIN
15      v.                              )
                                        )
16  JARROD COPELAND,                    )
                                        )  Date:  Tuesday, July 20, 2021
17         Defendant.                   )  Time:  10:30 a.m.
                                        )

GOV'T MOT. TO DETAIN
CR 21-274 CRB

<mark>Case 3:21-cr-00274-CRB Document 14 Filed 07/15/21 Page 2 of 14</mark>

**TABLE OF CONTENTS**

I.   INTRODUCTION……………………………………………………………………………..1

II.  BACKGROUND………………………………………………………………………………1

III. DISCUSSION…………………………………………………………………………………5

    A.   Legal Standard………………………………………………………………………5

        1.   COPELAND Was Planning Acts of Violence…………………………………..6

        2.   The Evidence of COPELAND's Guilt is Strong………………………………8

        3.   COPELAND Deserted from the U.S. Army, Joined an Anti-Government Militia Group, and Abuses Steroids…………………………………………8

        4.   COPELAND Poses a Danger to the Community……………..………………11

IV.  CONCLUSION………………………………………………………………………………11

# TABLE OF AUTHORITIES

Cases

*United States v. Dodge*, 842 F. Supp. 643 (D. Conn. 1994) ................................................................ 9

*United States v. Chen*, 820 F. Supp. 1205 (N.D. Cal. 1992) ................................................................ 6

*United States v. Diaz-Hernandez*, 943 F.3d 1196 (9th Cir. 2019) ................................................. 5, 6

*United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991) ........................................................................ 8

*United States v. Hir,* 517 F.3d 1081 (9th Cir. 2008) ....................................................................... 6, 8

*United States v. Mahon,* 2009 WL 2450466 (D. Ariz. Aug. 11, 2009) ................................................ 9

*United States v. Marzullo,* 780 F. Supp. 658 (W.D. Mo. 1991) ........................................................... 5

*United States v. Mitchell,* 23 F.3d 1 (1st Cir. 1994) ............................................................................. 5

*United States v. Motamedi,* 767 F.2d 1403 (9th Cir. 1985) .............................................................. 5, 6

*United States v. Varnes,* 2010 WL 2035573 (D. Ariz. May 20, 2010) ................................................. 5

*United States v. Winsor,* 785 F.2d 755 (9th Cir. 1986) ........................................................................ 6

Statutes

18 U.S.C. § 844(i) .............................................................................................................................. 4, 5

18 U.S.C. § 1512(c) ................................................................................................................................ 4

18 U.S.C. § 2332b(g)(5) ......................................................................................................................... 6

18 U.S.C. § 2332b(g)(5)(B) ................................................................................................................... 5

18 U.S.C. § 3142(e)(3)(C) ..................................................................................................................... 5

18 U.S.C. § 3142(f)(1) ........................................................................................................................... 5

18 U.S.C. § 3142(f)(2)(B) ..................................................................................................................... 5

18 U.S.C. § 3142(g) ............................................................................................................................... 6

18 U.S.C. § 3156(a)(4) ........................................................................................................................... 5

GOV'T MOT. TO DETAIN
CR 21-274 CRB                                     ii

**I.  INTRODUCTION**

Ian Rogers and Jarrod COPELAND plotted to attack targets associated with people and companies whose political views differed from their own. Both men were well-armed, and their plans were specific, detailed, and serious. Law enforcement arrested Rogers on January 15, 2021 and he remains in state custody, facing both federal and state charges. Officers searched COPELAND's residence and took his guns two days later, thus disrupting their planned attack. On July 7, 2021, a federal grand jury charged Rogers and COPELAND with, among other things, conspiring to maliciously destroy a building by arson. There is a presumption in this case that COPELAND should be detained because the arson charge is a crime listed in 18 U.S.C. § 2332b(g)(5)(B). COPELAND is also charged with obstruction of justice because he erased his communications with Rogers after he learned of Rogers's arrest. COPELAND should be detained. Both he and Rogers were animated by the kind anger that will not be abated or deterred by a court order. And all of the political and social conditions that motivated them to plan what they themselves described as a terrorist attack remain. The only way to protect the public is to ensure that COPELAND remains in custody. For these reasons, the government asks that the Court detain COPELAND pending trial in this matter.

**II.  BACKGROUND**

Rogers and COPELAND were upset with the outcome of the 2020 Presidential election. So they began to plan a series of violent attacks against targets associated with Democrats. Though they understood that they would be viewed as domestic terrorists,[1] they hoped that their violent acts might start a movement to overthrow the government.

The planning began on November 25, 2020, using encrypted messaging applications:

```
Rogers      Ok bro we need to hit the enemy in the mouth
COPELAND    Yeah so we punch soros
Rogers      I think right now we attack democrats
Rogers      They're offices etc
Rogers      Molotov cocktails and gasoline
COPELAND    We need more people bro
COPELAND    Gonna be hard
```

---

[1] In a message to Rogers on November 30, 2020, COPELAND said, "I think . . . we will get tagged as domestic terrorists". Rogers responded, "Like I care what we are labeled" and "I just hope our actions will make others to get involved . . .".

GOV'T MOT. TO DETAIN
CR 21-274 CRB                                           1

      * * *

| | |
|---|---|
| Rogers | Any thoughts on our first target? |
| Rogers | I think we should hit the Governors Mansion its empty no casualties |
| Rogers | Would send a message |
| COPELAND | That's the best target I think too |

      * * *

| | |
|---|---|
| Rogers | Any idea how to take it down? Either fire bomb or full auto ak fire |
| Rogers | I'm thinking full auto fire with fire will send the message we want |
| Rogers | We shoot it up and burn it down , WOLVERINES |
| COPELAND | I think we don't use bullets just burn it down |
| COPELAND | No ammo |

They continued the conversation two days later, on November 27, 2020, again using an encrypted messaging application.  Though Rogers originally suggested attacking the California Governor's mansion in Sacramento, he changed the target to the Democratic Headquarters building in Sacramento.  From that point on, and over the next 6-8 weeks, Rogers and COPELAND planned to attack that building.  The exchange, excerpted below, began when Rogers sent COPELAND a link to a map of the Democratic Headquarters building in Sacramento:

| | |
|---|---|
| Rogers | Numero uno |
| COPELAND | Right next to CHP |
| COPELAND | gotta be cautious |
| Rogers | Only take 3 minutes |
| Rogers | Take a brick break a window pour gas in and light |
| COPELAND | Yeah still though |
| Rogers | I think I'll do a drive bye and unload a couple drums into that commie building |
| COPELAND | Lol |
| Rogers | Quick and easy and a fire department is near bye so I don't think a fire will be effective |
| Rogers | 150 rounds shot into building will destroy it |
| COPELAND | Yeah true |
| Rogers | And a couple pipe bombs |
| COPELAND | That pipe bomb that shit |

The next day, Rogers again raised the topic of attacking the Democratic Headquarters in Sacramento, again using the encrypted messaging application:

| | |
|---|---|
| Rogers | So I've been thinking about that target in Sacramento , because the chipy station is so close we should fire bomb the place that will be quiet |
| Rogers | But I'm thinking a keg of gas like 17 gallons of gas |
| COPELAND | Yeah no bullets |
| COPELAND | That's a better plan |
| Rogers | Guns are too loud with that chippy station so close |
| Rogers | 17 gallons of gas that place will burn good |

Over the next few days, Rogers and COPELAND repeatedly discussed and refined the plan.  By

GOV'T MOT. TO DETAIN
CR 21-274 CRB                         2

December 1, 2020, the plan had taken shape, and Rogers was excited: "Do you think something is wrong with me how I'm excited to attack the democrats?" he asked. COPELAND later told police that he didn't take any of the talk seriously and that he was just listening to Rogers "blow off steam." But throughout, COPELAND encouraged Rogers, telling him things like, "If we see [Trump] can't win we strike" and "If they don't listen to trump they will hear us". On January 4, 2021, COPELAND initiated the discussion of violent attacks following the January 6, 2021 certification of the election results: "Well it will probably happen and we will become outlaws for real" "I've accepted it". "I got my zip tie handcuffs in today just in case got a 10 pack," he told Rogers. And indeed, when police searched COPELAND's residence on January 17, 2021, they found a "go bag" with food, clothing, identification cards (including passports), rifle and pistol magazines, and a package of 10 zip tie handcuffs.

"Heads must be taken," COPELAND said. "I don't like to think it but I think we will have to die for what we believe in," he added.

They discussed their plan further over the following days, including on January 11, 2021, this time using a different encrypted messaging application:

```
Rogers      I'm thinking sac office first target
Rogers      Then maybe bird and face offices
Rogers      Sad it's come to this but I'm not going down without a fight
Rogers      These commies need to be told what's up
COPELAND    I agree
COPELAND    Plan attack
* * *
Rogers      Let's see what happens after the 20th we go to war
COPELAND    Copy
```

In other words, Rogers was reaffirming that the Democratic Headquarters in Sacramento ("sac office") would be their first target, as they'd been planning over the previous two months, and then suggesting that they could attack the Twitter ("bird") and Facebook ("face") offices next. COPELAND's response leaves no doubt that he was committed to violence: "I agree" "Plan attack". Their trigger was going to be the inauguration on January 20, 2021.

Four days after that exchange, and just five days before the day Rogers and COPELAND anticipated "going to war" against other Americans, Napa Sheriff's deputies arrested Rogers and seized between 45 and 50 firearms, including numerous assault rifles and at least three machine guns, five

GOV'T MOT. TO DETAIN
CR 21-274 CRB                                    3

fully-assembled pipe bombs, and approximately 15,000 rounds of ammunition. Rogers is currently in state custody in Napa County, facing weapons charges arising out of those seizures.

COPELAND found out about Rogers's arrest the next day, and immediately took steps to purge his communications with Rogers. He asked a friend (who'd sent him a link to the media article about Rogers's arrest), "Do you think they look at our texts?" "Because they trace it to me because we talk about some shit bro". COPELAND also immediately notified one of the leaders of a militia group to which he belongs. That man's first response was "crap," as in, 'oh crap, that's not good.' He then advised COPELAND to switch communications platforms (from one encrypted messaging application to another), and to "delete all. Jarrod, this sucks but we will get through it," he said.

Officers searched COPELAND's residence the next day and seized his cell phone. COPELAND had indeed "deleted all" – his messages with Rogers were gone. Officers also seized three pistols (one of which belonged to Rogers), an assault rifle and another assault rifle lower, as well as a hunting rifle. They also found COPELAND's "go bags," bags of supplies he thought he would need in an emergency. The "go bags" contained clothing, identification, food, a tactical helmet, elbow and knee pads, rifle and pistol magazines, and the zip tie handcuffs mentioned above. The officers also found, and seized, at least two different kinds of anabolic steroids.

On July 7, 2021, a grand jury charged Rogers and COPELAND with conspiring to maliciously destroy a building by fire, in violation of 18 U.S.C. § 844(i) and (n). The Indictment also charges Rogers with possession of pipe bombs and machine guns, and charges COPELAND with obstruction of justice, in violation of 18 U.S.C. § 1512(c), for his destruction of his communications with Rogers. One week later, agents from the Federal Bureau of Investigation arrested COPELAND at his residence in Sacramento. At the time of the arrest, agents recovered the zip tie handcuffs COPELAND previously told Rogers were for use in their plot. The fact that he still had them six months later indicates that he still believed a situation would arise where he would need to take prisoners. They also found more anabolic steroids.

///

///

///

GOV'T MOT. TO DETAIN
CR 21-274 CRB                                       4

## III.  DISCUSSION

### A.  Legal Standard

The Bail Reform Act of 1984 requires a detention hearing, upon the government's motion, where the case involves a crime of violence, or possession of a destructive device.  18 U.S.C. § 3142(f)(1). The grand jury found probable cause to believe that COPELAND conspired to maliciously destroy a building by fire.  That crime is considered a "crime of violence" under the Bail Reform Act.  18 U.S.C. § 3156(a)(4); United States v. Mitchell, 23 F.3d 1, 2 n.3 (1st Cir. 1994); United States v. Varnes, 2010 WL 2035573, at *1 (D. Ariz. May 20, 2010) ("The Court finds that the malicious burning of any building, vehicle, or other real or personal property proscribed by 18 U.S.C. § 844(i) is a 'crime of violence' as defined by 18 U.S.C. § 3156(a)(4)."); United States v. Marzullo, 780 F. Supp. 658, 659 (W.D. Mo. 1991) ("This Court CONCLUDES that the crime of 'arson' as set forth in 18 U.S.C. § 844, amounts to a 'crime of violence' for the purposes of 18 U.S.C. §§ 3142, 3143 and 3156.").  In addition, COPELAND's co-conspirator is charged with possession of destructive devices.  Accordingly, the government is entitled to a detention hearing.

The Court may detain a defendant where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  Id. § 3142(e)(1).  Detention is appropriate where the defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).  The government must prove danger by clear and convincing evidence, and flight risk by a preponderance.  18 U.S.C. § 3142(f)(2)(B); Motamedi, 767 F.2d at 1406.  Categorical grants or denials of bail—untethered from an individualized determination—are impermissible.  See United States v. Diaz-Hernandez, 943 F.3d 1196, 1199 (9th Cir. 2019).

In a case like this, there is a presumption that COPELAND should be detained.  The Act creates a rebuttable presumption that no conditions of release can reasonably assure the defendant's appearance as directed and the safety of the community in cases where the person is charged with an offense listed in 18 U.S.C. § 2332b(g)(5)(B), for which the maximum statutory penalty is 10 years of more.  18 U.S.C. § 3142(e)(3)(C).  COPELAND is charged with conspiring to destroy a building by arson, in violation of 18 U.S.C. §§ 844(i) and (n).  That is one of the offenses listed in § 2332b(g)(5)(B), and the statutory

maximum is 20 years in prison. Accordingly, there is a presumption of detention in this case.

The presumption of detention shifts the burden of production to the defendant. See United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008). The defendant must show "some credible evidence" to rebut the presumption. United States v. Chen, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992). Even if the defendant provides that evidence however, the presumption retains evidentiary weight. Hir, 517 F.3d at 1086. Close cases should result in release. Chen, 820 F. Supp. at 1208 (citing United States v. Motamedi, 767 F.2d 1403, 1405-06 (9th Cir. 1985)).

The Court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged, "including whether the offense is . . . a Federal crime of terrorism, or involves a . . . destructive device"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986). Considering factors outside of those set forth in Section 3142 is disfavored. Diaz-Hernandez, 943 F.3d at 1199.

**1.     COPELAND Was Planning Acts of Violence.**

As described above, COPELAND and Rogers were planning violent attacks that they themselves understood were acts of terrorism. Indeed, their plot to destroy the Democratic Headquarters was an act of domestic terrorism: it was intended to influence or affect the conduct of government by intimidation or retaliate against government conduct; and it involved arson as a means to accomplish that goal. See 18 U.S.C. § 2332b(g)(5). As their own words make clear, their goal was to undo the results of a national election and install their preferred candidate in the Presidency. On November 27, 2020, they had the following exchange:

| | |
|---|---|
| Rogers | But it will send a fucking message man |
| Rogers | Scare the whole country |
| Rogers | Can you imagine cnn covering this haha ! |
| Rogers | I'll leave a envelope with our demands and intentions |
| Rogers | Basically saying we declare war on the Democratic Party and all traitors to the republic |

```
COPELAND    That's some expendables stuff
Rogers      We need to send a message
COPELAND    Yep I agree
* * *
Rogers      I've had enough, time to wake people up man
COPELAND    I know man this is serious
COPELAND    Let's see what trump is going to do
Rogers      He needs our help
COPELAND    I know
Rogers      The deep state is disgusting
Rogers      2 men can change the world if we want too
COPELAND    We don't need to win over 50,000 people we need 500 pissed off patriots
            that want America back
```

They selected their target because of its affiliation with the opposing candidate's political party, and they hoped to both terrify members of that political party, and inspire others to join them in committing similar acts of violence. They talked about writing a manifesto (which it appears they never did) to explain their purpose. They discussed, repeatedly, the need to recruit others to their cause. On November 30, 2020, Rogers told COPELAND, "I just hope our actions will make others to get involved , we need help , that's all I hope for". COPELAND responded, "[thumbs up emoji] that's what every patriot hopes". On January 4, 2021, Rogers said, "We need help though and I don't know how to get more people involved". COPELAND responded, "Proud boys and 3%" and "I emailed proud boys". Indeed, agents discovered a URL in the internet history on COPELAND's laptop that appears to indicate COPELAND filled out and submitted a form on the Proud Boys' website on or about December 28, 2020. This suggests COPELAND was trying to recruit others to join the plot, as he told Rogers. Then on January 13, 2021, just two days before Rogers's arrest, COPELAND told him "I got a few guys that are with us but they moved out of California".

COPELAND's messages with Rogers also suggest his willingness to leave California. Though he has lived in California since approximately 2007 (according to his statements to Rogers), he discussed leaving to live in a more conservative state. On December 15, 2020, after Rogers talked about leaving California, which he often referred to as "commie land," for a "red state," COPELAND said, "I wanna move but I like my job". On December 17, 2020, Rogers again talked about leaving California for Wyoming if Congress certified the election results on January 6, 2021. COPELAND again said that his job was awesome, but "I'm gonna try my best to move next year". Agents arrested COPELAND in

Sacramento in July 2021, so it may be that his plans changed. But he contemplated leaving California before he was facing federal criminal charges. Now that he is facing charges and a lengthy prison sentence, he has an even greater incentive to flee.

These facts indicate that COPELAND is both a danger to the community and a flight risk, and that he should be detained.

### 2. The Evidence of COPELAND's Guilt is Strong.

The Court does not attempt to pre-judge guilt at the bail hearing. But the Court still must consider the weight of the evidence as it can help establish dangerousness, Hir, 517 F.3d at 1090 (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that the defendant would pose a danger if released), and the possibility that the defendant will abscond if released, United States v. Gebro, 948 F.2d 1118, 1122 (9th Cir. 1991).

Here, the evidence against COPELAND is strong. His own statements – seized from Rogers's phone – demonstrate his participation in the conspiracy and his willingness to commit acts of violence. Further, he admitted to law enforcement that he'd had those conversations with Rogers, though he attempted to minimize their seriousness. And the complete absence of those communications in COPELAND's own phone, together with his statements to others and his admissions to law enforcement, are strong evidence that he deleted all his communications with Rogers after he discovered Rogers had been arrested because, as he told his friend, "we talk about some shit bro".

The strength of the evidence against COPELAND favors detention.

### 3. COPELAND Deserted from the U.S. Army, Joined an Anti-Government Militia Group, and Abuses Steroids.

The Court also considers the defendant's background and personal characteristics. COPELAND has a steady job that he appears to like, and he has no prior criminal convictions. He does not have an unblemished past, however. He joined the military in December 2013 and began basic training in January 2014, but was arrested for desertion in May 2014. He was arrested for desertion again in October 2016. He separated from the military in November 2016, and received an "Other than Honorable" discharge. His discharge code indicates that he was discharged in lieu of court martial.

When COPELAND entered active duty, he took an oath to support and defend the Constitution

of the United States against all enemies foreign and domestic" and that he would "bear true faith and allegiance to the same." See Oath of Enlistment at https://www.army.mil/values/oath.html (last visited July 15, 2021). After he was discharged, he joined an anti-government militia group, a "3%" affiliate. COPELAND later told law enforcement that his group were just "preppers" and were not preparing for civil war. But the ethos of groups like the so-called "3%-ers" is armed rebellion against the federal government, which they liken to a tyrannical occupying power.[2] Moreover, whereas COPELAND deserted from his U.S. military unit, he has ascended the ranks within the militia group. As of January 2021, he told Rogers that he had been offered an officer position as either "[c]ommunication or security." But, he said, "my communication consists of fists and bullets sooooo", perhaps meaning that he was a better fit for the security position.

To be clear, the government is not prosecuting COPELAND and Rogers because of their views. They are being prosecuted because they planned violent attacks. Cf. United States v. Mahon, 2009 WL 2450466, at *5 (D. Ariz. Aug. 11, 2009) ("The information described above suggests that Daniel and Dennis believe in the use of violence to further their political and social views. This is not a case of mere personal beliefs or First Amendment expression. . . . The evidence suggests that Defendants intended to act violently, not merely express their views."); United States v. Dodge, 842 F. Supp. 643, 646 (D. Conn. 1994) ("It is fundamental that a person cannot be prosecuted for holding unpopular beliefs, for speaking unpopular words, or for belonging to an unpopular organization. The First Amendment to our Federal Constitution safeguards us from this. The court, however, cannot accept Mr. Dodge's argument that he is being prosecuted because of his unpopular political beliefs and his membership in the Ku Klux Klan. In reality, the court finds that Mr. Dodge is being prosecuted for his action in acquiring a bomb and a silencer, which, by his very words, he intended to use on innocent people in violation of state and federal law.").

---

[2] The "3%" is an allusion to the claim that three percent of the population of the American colonies fought to overthrow British rule in the 18th Century. It is not clear that this has any basis in fact. But it is clear that Rogers and COPELAND subscribed to that belief. They repeatedly finished messages with the exclamation "Wolverines!" which is a reference to the 1984 movie "Red Dawn," which is about a group of high school kids in Colorado who form a guerilla resistance force and carry out attacks against a Soviet-backed occupying foreign army. That exclamation gives the Court some insight into both their lack of maturity and how deeply threatened they feel, which is a volatile combination.

COPELAND's membership in an anti-government militia, and his motivations for planning these attacks are relevant because they are not fleeting or the product of a single, but past, perceived affront. His sentiments are deeply felt and long-standing and reflect a belief that the government is illegitimate. He is not likely to obey rules imposed on him by someone he views as part of a tyrannical government. Indeed, the Court should scrutinize any assertion he may make that he will abide the Court's orders. His ascent within the ranks of an anti-government militia indicates that he is unlikely to respect the Court's authority to order him to do anything. That he considered himself a "patriot" for planning acts of violence is a measure of how little respect he has for the basic functions of government, including the courts. For a person who has expressed his willingness to die for what he thinks is a noble cause, the prospect of remand and forfeiture of a sum of money holds no power of suasion.

Moreover, COPELAND is a steroid abuser. He and Rogers purchased about $1,200 worth of steroids (including testosterone, dianabol and oxandrolone) in late December 2020, and officers seized COPELAND's portion of the steroids when they searched his residence on January 17, 2021. It appears he replenished his stock – when agents arrested him on July 14, 2021, they found more apparent steroids in his apartment. Steroids increase irritability and aggression. See "Steroids and Other Appearance and Performance Enhancing Drugs (APEDs) Research Report," Nat'l Inst. On Drug Abuse (rev. Feb. 2018) at 14.[3] "People who misuse anabolic steroids report more anger than nonusers, as well as more fights, verbal aggression, and violence toward their significant others, sometimes called 'roid rage.'" Id. COPELAND used steroids to get bigger – he and Rogers spoke constantly about working out and using steroids. COPELAND's own statements show that the steroids have the same mood-altering effects the studies described above found. On January 13, 2021, he told Rogers (following another discussion about the political situation in the United States), "the roids make me very angry".

///

---

[3] The report is available at: https://www.drugabuse.gov/download/815/steroids-other-appearance-performance-enhancing-drugs-apeds-research-report.pdf?v=b864e9e791bbde96f1c35024bc52084f (last visited July 14, 2021). The report notes that the research results may be confounded by personality traits more common among steroid abusers. In other words, maybe people who are more prone to certain anti-social behaviors seek out steroids. It doesn't matter for our purposes whether the steroids make COPELAND more violent and aggressive, or he seeks out steroids because he tends to be more violent and aggressive. Either way, he is a greater danger to the community.

GOV'T MOT. TO DETAIN
CR 21-274 CRB                                    10

### 4. COPELAND Poses a Danger to the Community.

The final factor the Court considers is the nature and seriousness of the danger the defendant poses to any other person in the community. COPELAND was planning violent attacks against political targets, and every indication is that he would have carried out his plan had law enforcement not intervened and disrupted the plot. Indeed, the violent insurrection at the Capitol on January 6, 2021 inspired him. He sent Rogers excited messages, "REVOLUTION" "REVOLUTION" "REVOLUTION" "I'm fucking juiced!!!!!" "I'm bout to throw my gear on and drive around and punish sombitces" "Bro I'm juiced" "I have my g19 in my hand," he said, referring to his Glock 19-style polymer 80 pistol. COPELAND was eager to get in on the action: "Damnit I wanna roll into sac geared up" he said, referring to his military-style tactical gear and weapons, "Drink 4 Red Bull's and fuck shit up". He is an extremist who abuses steroids and fantasizes about violence. The danger he poses to anyone with opposing political views is obvious.

Strict conditions of release might be able to mitigate the risk that he would flee, but they cannot mitigate the danger that he will cause damage or injury to others or their property.

## IV. CONCLUSION

For the reasons set forth above, COPELAND cannot rebut the presumption that he is both a danger and a flight risk. The government asks that he be detained pending trial.

DATED: July 15, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

*/s/ Frank J. Riebli*
FRANK J. RIEBLI
Assistant United States Attorney